439 A.2d 1236

CAMBRIA SAVINGS AND LOAN ASSOCIATION

v.

The ESTATE of Francis L. GROSS, Deceased by Dorothy M. Gross, Administratrix and Dorothy M. Gross, In Her Own Right.

v.

CONTRACTOR INDUSTRIES AND ACCEPTANCE CORPORATION and Hyman Datz, Individually.

Superior Court of Pennsylvania.

Argued March 16, 1981.

Filed Jan. 14, 1982.

352

James W. Carroll, Jr., Pittsburgh, for appellant.

Robert C. Riethmuller, Pittsburgh, for Cambria Savings, appellee.

David F. Alpern, Pittsburgh, for Contractor, et al., appellees.

Before PRICE, BROSKY and MONTEMURO, JJ.

MONTEMURO, Judge:

## INTRODUCTION

This appeal originated as an assumpsit action filed by plaintiff-appellee Loan Association, which had become the assignee of a contract originally executed by defendants-appellants (purchasers of aluminum siding) and additional defendants (the contractor who installed the improvement).

The court below instructed the jury extensively concerning the possibility of finding the contract a nullity and then finding the value of the work to be due and owing on a theory of quasi-contract and unjust enrichment. This theory then became the basis of the opinion of the court below. Upon review of the record, however, we find that this contract remained in force and effective until, under the terms of the contract, an event occurred which discharged the appellants' duties. Therefore, we reverse and remand to the lower court for entrance of judgment n. o. v. in accordance with this opinion.

## FACTS ON THE RECORD

The operative facts are not in dispute. The husband-purchaser had had a health problem and was at home recuperating and anticipating his return to work when he was approached by a contractor on the subject of aluminum siding for his home. The purchasers, husband and wife, discussed the improvements with contractor's agent, Mr. Datz, and agreed on the work and the price, but took precaution of adding the following clause:

This contract null and void if customer cannot get disability and death and sickness insurance. Customer to pay for insurance.

It is undisputed that "customer" was intended to mean husband-purchaser, Mr. Gross. The contract was signed October 6, 1971. It was in combination with an agreement which assigned the debt to plaintiff Loan Association.

Mr. Datz then dialed an insurance agent, Mr. Mulligan, and introduced him by telephone to Mr. Gross, who inquired into the necessary insurance. Mr. Gross thereafter sent a check to Mr. Mulligan to initiate placement of the insurance.

A couple of days after the contract was signed, the contractor's crew pulled up to the property to begin the work. Mr. Gross went out and told the men not to start the job as he had not yet received his insurance. A few days later the crew reappeared, and again Mr. Gross refused to permit them to start. The workmen asked to use the telephone and talked with agent Datz, who then had a conversation with Mr. Gross. Mr. Mulligan, the insurance man, then called. After this contact, Mr. Gross permitted the work to begin. The siding was in place approximately one week after the signing of the contract. (R. N.T. 69–73).

Mr. Gross returned to his job on November 1, 1971, but actually put in only ten days of work before becoming permanently disabled (N.T. 73–74). He remained unemployable until his death by suicide in 1979 (N.T. 79). While still working, on November 10, 1971, Mr. Gross signed a Completion Certificate. The language, as quoted in court, reads as follows:

Do not sign this certificate until the dealer has completed the work and/or delivered the materials in accordance with the terms of your contract or sales agreement. (N.T. 83).

Mr. Datz testified that there was no problem whatsoever in receiving this signature, although the Completion Certificate was "the most difficult thing in the world" to obtain if even "the most minorest problem" existed (N.T. 114).

On December 23, 1971, Mr. Gross was informed that he was denied the disability insurance, and his check was refunded. The insurance agent testified that there was no predictable waiting period for insurance, but that there was a requirement that the purchaser must know within six months. (R. Deposition, 37). He also explained that a person who qualifies at date of application should be covered despite later disability, but that a person already disabled and out of work for the foreseeable future would not be eligible for a policy. (R. N.T. 151).

Mr. Casselhoff, President and major stockholder of the additional defendant, acknowledged that he knew of the handwritten clause in the contract "immediately", and that it was his decision to send the crew out to do the work. When asked why he had made that decision, he replied:

A. Well, at that time, we had contacted Mr. Mulligan for the insurance, and Mr. Gross was satisfied that we were complying to the terms of the contract.

. . . . .

Q. What conclusion did you draw from his acquiescence?

A. I drew the conclusion, of course, that he was satisfied that we were fulfilling the contract.

Q. Whether or not there was insurance?

A. Right. (N.T. 160).

Later, under cross-examination, Mr. Casselhoff also admitted that he never received a written or oral waiver of the clause concerning disability insurance. (N.T. 165–66).

Mr. Datz, the agent with whom the purchasers dealt, asserted that in his experience customers sometimes waived

a condition, but when pressed he admitted that Mr. Gross had never done so.

Q. So isn't it true, Mr. Datz, that with this clause in the contract and insurance still not obtained, you went ahead and authorized the company to do this work?

A. Mr. Gross authorized us to go ahead and do this work, sir. . . . Subsequent to his conversation with Mr. Mulligan.

Q. Right. And this was while there was a clause in the contract that said if he cannot get disability insurance, it would be null and void?

A. Mr. Gross' knowledge, yes, sir.

Q. And with your knowledge?

A. Yes.

Q. And you realized that it could happen that you could put the siding up and this contract would be null and void?

A. I assume something could happen like that, sure. (N.T. 131–32).

## DISCUSSION

*Restatement of Contracts* 2d at § 224 defines "condition" as follows:

§ 224. Condition Defined

A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due.

The Reporter's Note following § 224 then discusses the replacement of the former terms "condition precedent" and "condition subsequent." Conditions precedent are now referred to simply as "conditions", and the section also abandons the use of "condition" as the *term* that makes an event a "condition." "Condition" now refers only to the *event itself.* "Conditions Subsequent", always a confusing terminology, are now dealt with under § 230, entitled "Event that Terminates a Duty."

The Reporter's Note also states that a contract may be "inartistically drafted" to state that the agreement "shall not come into existence until Event A occurs." However,

> ... it is better to view a contract *as already in existence*, but with the parties' respective performances subject to the specified event ... *Restatement of Contracts*, 2d, § 224, Reporter's Note at p. 164. ALI (1981).

When the contract is regarded as in force, the new *Restatement* gives guidance as to when duty under the contract may be extinguished. As already noted, this is a revised approach to the concept formerly entitled "condition subsequent."

§ 230. Event that Terminates a Duty

(1) Except as stated in Subsection (2), if under the terms of the contract the occurrence of an event is to terminate an obligor's duty of immediate performance or one to pay damages for breach, that duty is discharged if the event occurs.

(2) The obligor's duty is not discharged if occurrence of the event

(a) is the result of a breach by the obligor of his duty of good faith and fair dealing, or

(b) could not have been prevented because of impracticability and continuance of the duty does not subject the obligor to a materially increased burden.

(3) The obligor's duty is not discharged if, before the event occurs, the obligor promises to perform the duty even if the event occurs and does not revoke his promise before the obligee materially changes his position in reliance on it.

An analysis of the preceding wording from the *Restatement* leads us to conclude that the handwritten clause on the contract which is the subject of this litigation, though ambiguous in some respects, clearly refers to an event "not certain to occur", but which "must occur before performance is to become due." The event described, therefore, fits the definition of a "condition."

■ The event provided for in the contract terms was a negative condition—a failure to obtain disability insurance, which would terminate the duties under the contract. The event thus, not only fits the definition under § 224, *supra*, but also that of § 230, *supra*, and becomes an Event that Terminates a Duty, formerly a "Condition Subsequent."

Furthermore, the contract was *in existence* from October 6, 1971. The "inartistic" draftsmanship did not prevent the contract from being valid throughout the time that performance was due. Mr. Casselhoff and Mr. Datz testified that they regarded the contract as in force, and that Mr. Gross also considered it to be in force. Further, all parties knew no waiver had been made and that it was conceivable that the insurance would not be approved. Mr. Gross's act in signing the completion certificate certainly indicates that he did indeed see the contract as still in force as of November 10, 1971.

■ Consequently, what we have here is not a *void* contract, but rather a contract that continued in force until an event constituting a condition of the contract occurred to terminate a duty. The work in this instance was not performed in a legal vacuum which justifies an analysis in quasi-contract for value of the work. The lower court's instructions to the jury on that point were misleading and resulted in an incorrect finding on that point.

Examination of § 230 (2), the provision in which exceptions to the general rule on discharge are set forth, cannot apply here. The "impracticability" must be shown by the obligee. *See* Note after § 230, *Restatement of Contracts*, 2d at 190. The contractor here has never claimed a *necessity* for completion of the work at an early date. Clearly, it was perfectly practical to wait a couple of months to see whether the insurance would be forthcoming. "Continuance of the duty" against the obligor, Mrs. Gross, is not a minor matter, easily discharged. Mrs. Gross has proceeded *in forma pauperis* with the help of Legal Aid. The award of three thousand, six hundred thirty-five dollars and ninety cents ($3,635.90) does subject her to "a materially increased burden."

Also, the provision of § 230 (2)(a) is not brought into play under the instant facts. There is no allegation of bad faith, and the record certainly reflects good faith behavior by the purchasers.

As shown in the testimony cited *supra*, § 230 (3) cannot apply either. Both the contractor and his agent honestly admit that Mr. Gross never orally or in writing promised to pay for the work whether he received his insurance or not. The obligee, in this instance, the contractor, did materially change his own position by performance, but not on the strength of any promise by the obligor.

Examination of the wording of the clause does not help us to determine whether the parties originally intended the clause as a condition precedent to *any* performance, or an event that eventually terminated a duty of performance. The ambiguity must be resolved by the court upon review of the facts.

Certainly, Mr. Gross by his actions, appears to have originally interpreted the clause to mean that his own obligation to obtain insurance was a condition precedent to all other performance by either party. Mr. Casselhoff, however, seems *never* to have regarded the obtaining of insurance as a condition precedent. He was aware "immediately" of the existence of the clause, but twice sent his crew to perform; and, in the end, he rendered performance within one week of signing of the contract. Consultation between Mr. Gross and Mr. Datz and Mr. Mulligan resulted in a change of action on Mr. Gross' part, indicating his acceptance of the clause as a condition subsequent or an event causing termination of his duty of payment.

This court therefore finds that the ambiguity inherent in the wording of the clause was at this time resolved by the partes, and that the contractor, *under the terms of the existing contract*, assumed the risk that after his performance had been rendered, the condition provided as a termination of the duty of his obligor could occur.

Subsequent events, as we have seen, left the purchaser disabled, unhireable, and uninsurable.[1] The failure to obtain disability insurance is no reflection, therefore, of bad faith, but a clear impossibility.

The events of this case were fully covered under the terms of the contract. This is not, in fact, a case of unjust enrichment upon which a quasi-contractual right can be raised in law. The parties made a bargain and its terms were complied with, until, upon the happening of a specified event, the purchaser was released from his duty of payment.

Appellant's brief cites numerous cases supporting the proposition that courts will not rescue parties from the harsh results of their freely contracted agreements. *See, e.g., Third National Bank and Trust Co. of Scranton v. Lehigh Valley Coal Company*, 353 Pa. 185, 44 A.2d 571 (1945); *Durham Terrace Inc. v. Hellertown Borough Authority*, 394 Pa. 623, 148 A.2d 899 (1959).

Subsequent events have made the contractor's bargain a poor one. However, he knew when the clause was written into the agreement that he had conceded something unusual to his customer as a part of the bargaining process. He also knew, and admits he knew, that Mr. Gross never promised to waive the written condition, and that it was possible that the work could be done and yet the insurance refused. The injury the contractor and its assignee, the Savings and Loan Association, have suffered, is not through a failure of duty of the purchasers, but from their own risks freely assumed under the contract.

Therefore, this court must reverse the holding of the court below and remand so that a judgment non obstante veredicto may be entered.

PRICE, J., did not participate in the consideration or decision of this case.

1. Although appellees argue that Mr. Gross could have obtained insurance at a higher premium, the testimony of the insurance agent makes it clear that the chances of a disabled and unemployed person obtaining disability insurance are non-existent.